**IN THE UNITED STATES DISTRICT COURT FOR**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **NO. 3:19-cr-00118** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **AMADOR MAGALLON GUERRERO** | ) | |

**MEMORANDUM AND ORDER**

Pending before the Court are four motions to suppress evidence file by Defendant Amador Magallon Guerrero: (1) Motion to Suppress Illegally Obtained Statements (Doc. No. 249); (2) Motion to Suppress Evidence Stemming from Illegal Search of Mr. Guerrero's Two Cell Phones (Doc. No. 250); (3) Motion to Suppress Evidence Obtained Pursuant to Facebook Warrant (Doc. No. 253); and (4) Motion to Suppress Evidence Obtained Pursuant to Illegal Wiretaps on Target Telephones 1 AND 2 (Doc. No. 256). The Government responded to the motions. (Doc. Nos. 320, 322, 313, 315).

First, because Guerrero does not challenge probable cause as to the Facebook Messenger evidence, and the Government responded that it will not introduce any evidence from Facebook other than the Facebook Messenger evidence (Doc. No. 313), the Motion to Suppress Evidence Obtained Pursuant to Facebook Warrant (Doc. No. 253) is therefore **MOOT**.

The Court held an evidentiary hearing on the remaining motions on January 26, 2023 and February 1, 2023, and the parties filed post hearing briefs. (*See* Doc. Nos. 348, 351, 362 (sealed), 366 (sealed)).[1]  For the reasons stated herein, Defendant's motions to suppress evidence (Doc. Nos. 249, 250, 256) are **DENIED**.

---

[1]     An Excerpt of the Transcript from the proceedings held on January 26, 2023, is filed under seal at Docket Entry 358.

# I.    BACKGROUND

The Drug Enforcement Agency ("DEA") was first alerted to Guerrero through intelligence from a confidential source in August 2017, but the investigation of Guerrero and others for federal drug and money laundering crimes did not begin until June 2018. (Doc. No. 316 ¶ 13). The investigation broadly concerned a multi-celled drug trafficking organization that was suspected of distributing narcotics in the Middle District of Tennessee. The objectives of the investigation included identifying local wholesale distributors and members of their organization, determining their method of acquisition and distribution of narcotics, and the identity of their associates and co-conspirators. (*Id*. ¶ 50). In connection with its investigation, DEA agents sought and obtained wiretaps on two cellphones utilized by Guerrero through two successive applications in August and September 2018, both of which were approved by the Chief Judge of this court ("Issuing Judge") in a separate, sealed matter.

On April 24, 2019, a Grand Jury returned an eight-count indictment against Defendant Amador Magallon Guerrero and four others. (*See* Doc. No. 3). Guerrero is charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine (Count I), conspiracy to distribute possess with intent to distribute one kilogram or more of heroin (Count II), distribution of 50 grams or more of methamphetamine (Count III), distribution of cocaine (Count IV), attempted possession with intent to distribute 500 grams or more of cocaine (Count V), possession with intent to distribute 100 grams or more of heroin (Counts VI and VII), and conspiracy to commit money laundering (Count VIII). (*Id.*).

Guerrero was arrested on May 2, 2019, at his home in Madison, Tennessee, and brought to the Estes Kefauver federal building in Nashville, Tennessee, where he was questioned by DEA agents for approximately two hours before he was booked and arraigned. (*Id*. at 19). While in the

custody of the DEA agents, Guerrero purportedly waived his *Miranda* rights, and consented to the search of two cellular phones.

Now before the Court are Guerrero's motions to suppress evidence obtained from the wiretaps, statements made on May 2, 2019, and the evidence obtained from the search of his cell phones. (*Id*. at 19-21, 34-35)

## II. MOTION TO SUPPRESS WIRETAP EVIDENCE

Guerrero moves to suppress all evidence obtained from the government's Title III wiretap of his cell phones and information derived therefrom on the basis that the affidavits supporting the wiretap applications failed to establish a necessity for the interception of the defendant's electronic communications. (*See* Doc. No. 256). The Government argues that in both instances DEA Special Agent Ganon Hicks ("SA Hicks") considered non-wiretap techniques prior to applying for wiretap authority and informed the issuing court as to the reasons for his belief that such non-wiretap techniques had been or likely would be inadequate. (*See* Doc. No. 315).

### A. Background

The government obtained the wiretaps at issue through two successive applications in August and September 2018 (hereinafter "First Application" and "Second Application"). Each application was supported by a lengthy affidavit from SA Hicks, who was involved in the ongoing criminal investigation.[2] The affidavits contain a summary of SA Hicks' background and qualifications,[3] detailed information concerning the operation of the drug trafficking organization,

---

[2]     The affidavits are filed under seal in this case at Docket Nos. 316 and 318. The affidavit supporting the First Application ("First Affidavit") is 52 pages (98 paragraphs) (*See* Doc. No. 316). The affidavit supporting the Second Application ("Second Affidavit") is 93 pages (137 paragraphs) (*See* Doc. No. 318).

[3]     According to his affidavits, Special Agent Hicks is an experienced DEA officer who, prior to filing the applications at issue here, had conducted narcotics and drug-related investigations. (*See, e.g.*, First Affidavit ¶ 2; Second Affidavit ¶ 2). In the course of these investigations, he became familiar with and

the identities of individuals expected to be intercepted through the wiretap(s), a list of the crimes that the target subjects allegedly had committed or would commit (either directly or by aiding and abetting), a description of the information provided by and/or activities undertaken to support the investigation by multiple confidential sources, a description of any recorded discussions involving investigatory targets (consensual or otherwise), a telephone toll record analysis, a stated basis for the need for interception of wire communications, a description of the non-wiretap means undertaken in the investigation, a description of why certain investigative techniques were not undertaken, and information regarding minimization.

The Court has reviewed the wiretap applications and supporting materials in their entirety. Due to their length, the court will reference only the most relevant facts in this order.

1. First Affidavit

The First Affidavit states that the investigation of Guerrero began in June 2018. (First Affidavit, ¶ 13). The investigation in this case broadly concerned a Drug Trafficking Organization ("DTO") with multiple cells distributing narcotics in the Middle District of Tennessee. (*Id*.). The objective of the wiretap was described as identifying the local and wholesale distributors and members of their organizations (including the target suspects), the method and acquisition and distribution of methamphetamine, heroin, and cocaine, the nature and scope of their illegal activities, the relationship between the financiers, transporters, suppliers, and distribution of the controlled substances, and the collection and distribution of monies which stem from the illegal drug activities are not likely to be achieved without the interception of Target Telephone 1. (*Id*. ¶ 50).

---

utilized a variety of investigative techniques, including conducting physical and electronic surveillance, monitoring court-authorized wiretaps, and managing the use of confidential sources. (*Id*. ¶ 3)

4

During the investigation preceding the First Affidavit, the government utilized two confidential sources to gather information (hereinafter "CS-1," and "CS-2"). In addition to procuring evidence through confidential sources, the government undertook other traditional investigative techniques before filing the First Affidavit. For instance, it conducted a telephone toll analysis of Target Telephone 1, which demonstrated that Guerrero was frequently in contact with target suspect, Felix Cortez. (*Id*. ¶ 48). The government also attempted to conduct physical surveillance of Guerrero, with limited success. One attempt in July 2018 to conduct physical surveillance of Guerrero's residence had to be abandoned because Guerrero recognized the surveillance vehicle as one not normally seen in the neighborhood and walked over to examine it more closely. (*Id*. ¶ 55). As the vehicle continued to stay in the surveillance position, Guerrero again approached the vehicle requiring the agent in the vehicle to speak with Guerrero, thus eliminating that vehicle from the surveillance of a controlled purchase. (*Id*.). The government also installed a pole camera capable of observing Guerrero's residence, but this external surveillance was of limited value because Guerrero and visitors often parked at the rear of the house, out of sight of the street and the pole camera. (*Id*. ¶ 80). The government also attempted to use GPS tracking devices, with limited success. Two attempts in July 2018 to conduct surveillance using tracking devices installed on a target suspect's vehicle and on Guerrero's 2007 Chevrolet Cobalt provided only limited information as both the target suspect and Guerrero routinely change the vehicles they drive. (*Id*. ¶ 83).

The First Affidavit also states that various other investigative measures had been considered but not attempted, for the following reasons:

*Pen Register:* In SA Hicks' experience, pen registers and toll analysis are of limited value in investigating drug-trafficking organizations because the phones may be registered under fictious names or, for pay-as-you go phones, no name at all. (*Id*. ¶¶ 60-64)

*Grand Jury Subpoenas*: Based on SA Hicks' experience, grand jury subpoenas were premature in August 2018. Furthermore, not all of the members of the Middle Tennessee-based organization had been fully identified such that agents did not have the ability to serve grand jury subpoenas on those unidentified individuals. Additionally, SA Hicks believed that if the identified members of the conspiracy, their co-conspirators, and other participants were called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. Finally, service of grand jury subpoenas would alert target subjects to the investigation, causing them to be more cautious, and/or to flee, to threaten informants, or otherwise compromise the investigation. (*Id*. ¶¶ 65-66)

*Confidential Sources*: Although CS-1 and CS-2 had been helpful, based on SA Hicks' training and experience, these confidential sources would likely not be helpful in identifying sources of supply or the money launderers. (*Id*. ¶ 70)

*Undercover Agents*: SA Hicks did not think undercover agents were likely to succeed in this case because it appeared the DTO is comprised of close, if not familial, relationships. In SA Hicks' experience, members of narcotics trafficking organizations only deal with long-time associates. Furthermore, because members of the DTO appear to utilize counter-surveillance techniques, it would be difficult to protect the safety of undercover agents operating within the organization. (*Id*. ¶ 73).

*Consensual Recordings*: Although both confidential sources recorded discussions with Guerrero and another target suspect, Jacobo Nava, which helped reveal some details about the

6

DTO, SA Hicks stated that the information was vague, had not helped identify sources of supply or co-conspirators, and further recorded calls were not likely to meet the objectives of the investigation. (*Id*. ¶ 74)

*Interviews of Witnesses and/or Subjects and Arrest Warrants*: SA Hicks stated that interviews would be of minimal value to the investigation because the most knowledgeable subjects are also participants in the crimes under investigation and would be unlikely to cooperate and provide information without "tipping off" their co-conspirators, and because interviews could result in disclosure of the investigation and lead to the destruction of evidence and/or flight from prosecution. (*Id*. ¶¶ 75-77).

*Search Warrants*: Based on SA Hicks' experience, the use of search warrants at that time would be unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy. Moreover, execution of search warrants would tip off targets of the investigation, causing them to curtail or conceal their activities, thereby bringing the investigation to a premature conclusion. (*Id*. ¶ 78-79)

2. Second Affidavit

The Second Application added seven new "targets" to the investigation, about whom the Second Affidavit provided background information concerning their involvement with Guerrero and criminal histories. (Second Affidavit, ¶¶13(e)-(k)). The Second Affidavit also added supplemental information concerning certain non-wiretap investigation techniques, including a telephone toll analysis for Target Telephone 2 demonstrating that Guerrero was in contact with various individuals, and another attempt at physical surveillance on September 12, 2018, that failed because the targets identified law enforcement. (*Id*. ¶¶ 84, 93).

7

**B.    Analysis**

"To use a wiretap, federal law enforcement officials must describe to an authorizing judge 'whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Castro*, 960 F.3d 857, 863 (6th Cir. 2020) (quoting 18 U.S.C. § 2518(1)(c)). "This 'necessity requirement' ensures that wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Id.* (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)). "Even so, the purpose of the necessity requirement is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Id.* (citations and internal quotations omitted). Accordingly, district courts get "considerable discretion" in determining whether the necessity requirement has been satisfied. *United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017).

To satisfy this "necessity" requirement, the government must show: (1) the wiretap is not the investigation's "initial step"; (2) traditional techniques would not suffice; and (3) if investigators rely on prior experiences in explaining the inadequacy of traditional techniques, those experiences relate "to the particular facts of the investigation at hand." *United States v. Mosley*, 53 F.4th 947, 953 (6th Cir. 2022) (quoting *United States v. Gardner*, 32 F.4th 504, 515–17 (6th Cir. 2022) (citation omitted)).

To establish the necessity of the wiretap, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. Instead, "all that is required is that the investigators gave serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that

8

the court be informed of the reasons for the investigator's belief that such non-wiretap techniques have been or will likely be inadequate." *Id*. at 163–64 (quoting *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)). "The standards contained in the Act do not require proof of the absolute impossibility of all other means. Instead, a reasonable statement of the consideration or use of other investigative means is adequate." *Id*. at 164. In analyzing whether the government met the necessity requirement, the court must accord "great deference" to the determination of the issuing judge. *United States v. Corrado*, 227 F.3d 528, 539-40 (6th Cir. 2000).

Here, the government has made the requisite showing that the wiretap was not the investigation's "initial step." The investigation proceeded for two months before the government filed the First Application for a wiretap. That investigation included both live and electronic physical surveillance, controlled drug purchases, multiple consensually recorded phone calls, toll analysis, and efforts to trap and trace Guerrero's cell phone, among other efforts. The Second Affidavit provided relevant updated information concerning the ongoing investigation. Accordingly, the Court finds that the wiretap requests concerning these affidavits were not made as the "initial step" in the government's investigation.

Furthermore, the First and Second Affidavits provided the Issuing Judge with a substantial explanation of the limits on non-wiretap investigative techniques. For example, the First Affidavit provides case-specific details limiting the physical surveillance of Guerrero personally, the difficulty in utilizing pen registers because Guerrero frequently changed phones, the limitations on the ability of the investigation's confidential informants to conduct effective consensually recorded telephone calls that aided in the objectives of the investigation, and the limitations on the helpfulness of GPS tracking devices. The Second Affidavit provided similar information concerning the second wiretap.

SA Hicks' detailed statements concerning the techniques that were considered, but not attempted, also demonstrate "serious consideration" of the use of alternative investigative techniques. He stated that techniques such as grand jury subpoenas, search warrants and arrest warrants, undercover agents, and witness interviews either risked compromising the entire investigation by tipping off the subjects of the investigation and/or were unlikely to be successful. For example, the use of undercover agents was deemed unworkable because, in addition to the usual concerns about the safety of the undercover agent, the target organization was comprised of close, if not familial, relationships which would make an introduction difficult.

Guerrero argues the wiretap was not "necessary" because certain investigative techniques were insufficiently utilized. But the Government is not required to exhaust all available alternative investigative techniques before applying for a wiretap. *See United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir. 1988) ("[T]he government is not required to provide that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.") (quoting *Alfano*, 838 F.2d at 163). Moreover, "nothing requires the government to call off its investigation after it achieves only some of its goals." *United States v. Castro*, 960 F.3d 857, 864 (6th Cir. 2020) (citing *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) (noting that "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance")).

Accordingly, under the applicable legal standard and showing the requisite "great deference" to the Issuing Judge's determination, the Court finds that the Issuing Judge was presented with a substantial showing of necessity in connection with both the First Application and the Second Application. The motion to suppress evidence obtained from the wiretaps will, therefore, be **DENIED**.

10

### III. MOTION TO SUPPRESS ILLEGALLY OBTAINED STATEMENTS

**A. Background**

At approximately 6:00 a.m. on May 2, 2019, DEA agents arrested Guerrero on the federal indictment at his home in Madison, Tennessee. (Evidentiary Hearing Trans., Doc. No. 358 at 12). While at Guerrero's house, agents ask Guerrero whether there were weapons in the house. (*Id*. at 12-13). Guerrero responded that there were two guns and directed the agents to their location. (*Id*. at 13).

The agents then brought Guerrero to the Estes Kefauver federal building in Nashville, Tennessee. (*Id*. at 18). At the time, several federal agencies were located or had offices in the building, including the United States Marshals Service, the United States District Court for the Middle District of Tennessee, and the DEA. Before his booking and initial appearance, two agents, SA Hicks and SA Matthew Passmore, took Guerrero to an interrogation room for questioning.[4] They asked him for his name, whether he had a social security number, and whether he had any prior arrests.[5] (Trans. at 2-3). Agent Hicks also questioned Guerrero about his family members, including their names, ages, and place of residence. (*Id*. at 3-7). These initial questions lasted a few minutes.  Agent Hicks then advised Guerrero of his rights in the following exchange:

> Agent Hicks:   … So, this is kind of like on T.V. –
>
> Guerrero:       Uh-huh (affirmative).
>
> Agent Hicks:   -- when they read your rights, right?
>
> Guerrero:       Yeah, yeah.

---

[4]    The custodial interview was video recorded (*see* Evidentiary Hearing, Gov't Ex. 11) and transcribed (*see* Doc. No. 252-2). For ease of reference, citations are to the transcript at "Trans. at [page]."

[5]    Agent Hicks' already knew that the Metropolitan Nashville Police Department had arrested Guerrero previously for possession with intent to distribute marijuana and cocaine. (First Affidavit ¶ 12(a)); Second Affidavit ¶ 13(a)); *see also* Doc. No. 369 at 1 (stating that SA Hicks knew Guerrero had a prior arrest and only asked Guerrero about prior arrests to segway into informing Guerrero of his *Miranda* rights).

11

| Agent Hicks: | So, you have the right to remain silent. Anything you say can and will be used against you in a court of law. |
|---|---|
| Guerrero: | Uh-huh (affirmative). |
| Agent Hicks: | You have the right to have an attorney present with you during questioning. And if you can't afford an attorney, the Government will provide one for you. |
| Guerrero: | Okay. |
| Agent Hicks: | Okay. Do you understand those? |
| Guerrero: | Yes. |

(*Id*. at 7-9). Guerrero was not presented with a written *Miranda* warning or asked to sign a waiver.

After being advised of his rights, Guerrero engaged with the agents and went into significant detail regarding the drug operation. (*Id*. at 9-145). During the interview, the agents asked Guerrero for consent to search two cell phones belonging to Guerrero that were seized at the time of his arrest. Guerrero signed a consent form as to a search of two of his cell phones. (*Id*. at 20-32). The validity of the consent to search the cell phones is discussed separately below.

Defendant spoke with the agents for approximately 90 minutes. Following the questioning, he was brought to the U.S. Marshals Office for booking and then to the Magistrate Judge for an initial appearance. (*See* Doc. No. 14).

**B.    Analysis**

Guerrero seeks to suppress the statements obtained on May 2, 2019, as illegally obtained in violation of his Fifth Amendment Right against self-incrimination and Sixth Amendment right to counsel. (*See* Doc. No. 249). Specifically, he argues: (1) that the initial questioning at his home was in absence of *Miranda* warnings or a knowing and voluntary waiver of his rights; (2) all

questioning at the DEA office was tainted by the initial questioning; and (3) that any waiver of his right against self-incrimination was neither knowing nor intelligent. (*Id*. at 6).

The Government responds that Guerrero was advised of his *Miranda* rights prior to questioning at the DEA office, and that he knowingly and intelligently waived those rights and voluntarily spoke with investigators. The Government states that it will not use any pre-*Miranda* statements in its case-in-chief. (Doc. No. 378). Accordingly, the Court does not consider the admissibility of these statements.

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, "[s]tatements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprised of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966)).[6]

The contours of the "*Miranda* warning" are well known. *See United States v. Clayton*, 937 F.3d 630, 637 (6th Cir. 2019). Before a custodial interrogation, an officer must give the suspect the following four warnings: "(1) you have the right to remain silent, (2) anything you say can be used against you in a court of law, (3) you have the right to the presence of an attorney, and (4) if you cannot afford an attorney, one will be appointed for you before any questioning if you would like." *Id*. (citing *Miranda*, 384 U.S. at 479). An officer is not required to read these rights verbatim,

---

[6]    Interrogation "refers not only to express questioning" but also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Imis*, 446 U.S. 291, 300–301 (1980) ("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."); *see id*. at 302 ("By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial.").

13

but he must give a warning that "reasonably conveys the rights at issue." *Id*. at 637-38. "[The] test is a practical one: Would a suspect hearing the warnings reasonably understand his options regarding interrogation?" *Id*. at 638.

"[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *United States v. Williams*, 998 F.3d 716, 736 (6th Cir. 2021) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010)). "A waiver, therefore, can be implicit, but an invocation must be explicit." *Id*.

The government bears the burden of proving, by a preponderance of the evidence, that *Miranda* rights were waived "voluntarily, knowingly and intelligently." *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015). To determine whether a waiver is valid, courts examine the totality of the circumstances. *Id*.

"A suspect waives his rights knowingly and intelligently if he 'understand[s] the basic privilege guaranteed by the Fifth Amendment,' but he need not comprehend 'every possible consequence of a waiver.'" *Wesson v. Shoop*, 17 F.4th 700, 704 (6th Cir. 2021) (citing *Colorado v. Spring*, 479 U.S. 564, 574-75 (1987)). "A waiver is voluntary where the suspect's decision to talk is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "A waiver is coerced if '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.'" *Id.* (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). "The coercion inquiry looks to several potential considerations: the age, education, and other characteristics of the suspect; whether the suspect was advised of his

14

*Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep, or other creature comforts." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

1. Effectiveness of the *Miranda* warning

Guerrero submits that he was not properly apprised of his right to the presence of an attorney during custodial interrogation and that he could decide to exercise his rights at any time, as required by *Miranda*. (*See* Doc. No. 249 at 11).

Here, Agent Hicks advised Guerrero that he had the right to remain silent and that he had the right to have an attorney present during questioning. This was a deviation from the standard *Miranda* warning. Hicks stated that he finds it is better to advise someone of their *Miranda* rights "in a conversational way, as opposed to stopping and make it awkward for them[.]" (Doc. No. 358 at 72). This deviation does not itself render the warning ineffective. *See Clayton*, 937 F.3d at 637 (stating that "we do not require any specific formulation of [the *Miranda*] rights"). The question is whether the verbal warning given to Guerrero reasonably conveyed the right to counsel. *Id.*

The Sixth Circuit considered a similar situation in *United States v. Clayton*, 937 F.3d 630 (6th Cir. 2019). In *Clayton*, the defendant was advised that he had the right to talk to a lawyer *before questioning*, but not specifically that he had the right to an attorney *during questioning*. This is the mirror image of the warning given to Guerrero, who was advised that he had the right an attorney *during questioning*, but not specifically that he had a right to an attorney *before questioning*. Nevertheless, the holding in *Clayton* is instructive. The *Clayton* court found that advising the defendant that he had a right to talk to a lawyer before questioning reasonably conveyed the right to have an attorney always present. *Id.* at 639. The court noted that *Miranda*, "merely required that a defendant be informed of his right to 'the presence of an attorney.'" *Id.*

(citing *Miranda*, 384 U.S. at 479). And although *Miranda* explained that "'presence' includes the right to consult with an attorney before and during questioning … *Miranda* did not require a warning exactly to that effect." *Id*.

Following the guidance of *Clayton* and *Miranda*, the Court finds that Guerrero was reasonably apprised of his right to counsel.

### 2. Voluntary, Knowing, and Intelligent

Guerrero argues the totality of the circumstances shows that he did not voluntarily, knowingly, and intelligently waive his Fifth Amendment rights. He points to pre-Miranda questioning, the "haphazard" delivery of the *Miranda* warning, his "noticeable language difficulty," the agents' failure to specifically ask if he wanted to waive his *Miranda* rights, and his hesitancy to answer questions due to concern for his family's safety. (*See* Doc. Nos. 249, 366 (sealed)).

Guerrero's contention that his statements were the product of coercion because he expressed hesitancy to speak to the agents due to fear that it would place his family at risk are not well taken. The fact that Guerrero was initially hesitant to speak with officers due to concerns for his family's safety, but nevertheless decided to speak, does not indicate that his statements were coerced. The Court would likely conclude differently if the agents had used a risk to his family to persuade him to talk, but that is not the case.

Nor are the other circumstances of the interrogation suggestive of intimidation, coercion, or deception. The interrogation was relatively short – less than two hours. It did not take place under extreme physical conditions. Guerrero was 29 years old and of limited education, but he had been in the United States for more than ten years, told officers that he understands English, and communicated effectively during the interview. (*See* Doc. No. 252-2 at 30). The recording of the

16

interview does not indicate that Guerrero had trouble understanding or responding to the agent's questions. (Evidentiary Hearing, Gov't Ex. 11).

Finally, SA Hicks issued a *Miranda* warning to Guerrero. "[T]he issuance of a *Miranda* warning makes it less likely that police conduct will overbear a suspect's will." *United States v. Jacobs*, 63 F.4th 1055, 1059 (6th Cir. 2023) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)). True, the agent never expressly asked Guerrero if he wanted to waive his right to refuse to answer questions after receiving the *Miranda* warning. But just as an express waiver is not required, neither is an express request for a waiver. *Williams*, 998 F.3d at 736 (6th Cir. 2021) ("A waiver can [] be implicit, but an invocation [of rights] must be explicit.").

Guerrero also argues that his lack of fluency in English hampered his understanding of the Miranda warnings such that any waiver was not knowing and intelligent. In support of this argument, he presented the testimony of Susan Berk-Seligson, Ph.D., an expert in forensic linguistics. Dr. Berk-Seligson testified that, based on her interview and testing, Guerrero did not fully understand the *Miranda* rights read to him. (Doc. No. 249-2). She attributes this to the speed with which the rights were read and Guerrero's limited grasp of English. (*Id*.).

Dr. Berk-Seligson's opinion is of limited value in this inquiry. This is because "the comprehension [] aspect[] of the waiver inquiry should be examined 'primarily from the perspective of the police,' such that where '[the] police had no reason to believe that [the defendant] misunderstood the warning, ... there is no basis for invalidating [the] Miranda waiver.'" *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc)); *see also*, *United States v. Villa-Castaneda*, 755 F. App'x 511, 517 (6th Cir. 2018) (affirming denial of motion to suppress where "[t]he agents had no reason

17

to suspect that Defendant's knowledge of English was so limited that he would be unable to waive his rights knowingly and intelligently.").

Here, SA Passmore and SA Hicks had no reason to believe a language barrier prevented Guerrero from understanding his rights. During the interrogation, Guerrero informed them that Spanish is his first language, and he reads Spanish better than English, but he understands English. (Doc. No. 252-2 at 30). SA Passmore testified that there were numerous intercepted calls and text messages between Guerrero and others that were conducted exclusively in English and that he had no reason to believe that Guerrero struggled to understand any part of the interview. (Doc. No. 358 at 11, 24). SA Hicks testified that SA Passmore did not read the Spanish version of the *Miranda* warning because "over the course of the investigation, through the CS recorded phone calls, the controlled buys, the wire intercepts and just [their] interactions that morning, [they] believed [Guerrero] to be competent in English and hold a discussion knowing this very well." (Doc. No. 358 at 72).

The recording of the interview supports this testimony. (*See* Evidentiary Hearing, Gov't Ex. 11). Guerrero conversed freely with the agents, giving no indication that his he was unable to understand the questions asked or the *Miranda* warnings when given. (*Id*.). Indeed, when Agent Hicks asked Guerrero if he understood the *Miranda* rights that had just been read to him, Guerrero responded, "Yes." (*Id*.; *see also*, Transcript, Doc. No. 252-2 at 7-8). Although, "language difficulties may impair the ability of a person in custody to waive [his *Miranda*] rights in a free and aware manner," *Al Cholan*, 610 F.3d at 954, the agents had no reason to doubt that Guerrero understood and knowingly waived the *Miranda* rights.

18

3. <u>Continuous Interrogation</u>

Guerrero argues that any waiver of the *Miranda* rights was ineffective under *Missouri v. Seibert*, 542 U.S. 600 (2004) because he was *Mirandized* after he had already made pre-*Miranda* incriminating statements during his arrest. (Doc. No. 249 at 10). In *Seibert*, "the Court recognized that *Miranda* warnings usually will be ineffective in a successive interrogation that is 'close in time and similar in content' to the pre-*Miranda* admission." *See United States v. Ray*, 800 F.3d 244, 267 (6th Cir. 2015).

The Sixth Circuit adopted the multi-factor test announced by the *Seibert* plurality. *Id*. at 272. "Under the multi-factor test, the admissibility of statements given after midstream *Miranda* warnings hinges on whether 'a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.'" *Id*. at 272-73 (quoting *Seibert*, 542 U.S. at 616 (plurality opinion)). The relevant factors are: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*.

As an initial matter, the Court notes that the circumstances of Guerrero's interrogation and waiver are far afield from those in *Seibert* where the defendant was subjected to "systematic, exhaustive" questioning, *Mirandized* only after confessing, and then pressured to confess again. *Seibert*, 542 U.S. at 616. Here, there is very little overlapping content between the pre-*Miranda* and post-*Miranda* statements. During his arrest at the house, the questioning was limited to whether there were weapons in the house. There was some post-*Miranda* discussion of the firearms

19

seized from the house, but the vast majority of the post-*Miranda* questioning was about Guerrero's drug business, including his sources of supply, details of how the drugs arrived in this district, how he paid for the drugs, and how drug money was transferred through banks. (*See* Interview Transcript, Doc. No. 252-2). They also discussed the role of his co-conspirators. *Id*.

As to the remaining considerations, the questioning agents were the same. However, the timing and location of the pre and post *Miranda* questioning and the change in topics is not indicative of a continuous round of questioning. Moreover, as a practical matter, the Court struggles to see how the prior admission that there were weapons in the house would affect Guerrero's decision to speak to agents about the details of an alleged drug operation.

Under the circumstances of this case, considering the plurality factors listed above, the Court finds that a reasonable person in Guerrero's shoes would have seen the questioning at the DEA office as a sufficiently distinct experience such that the *Miranda* warning presented a genuine choice whether to answer additional questions.

For the foregoing reasons, the Court finds that Guerrero's statements to the DEA agents during the custodial interview on May 2, 2019, were voluntary and preceded by knowing and intelligent waiver of his *Miranda* rights. Accordingly, the motion to suppress statements (Doc. No. 249) will be **DENIED**.

## IV.     MOTION TO SUPPRESS EVIDENCE FROM TWO CELL PHONES

Guerrero moves to suppress all evidence seized from the warrantless searches of his two cell phones, on grounds that the searches were in violation of his Fourth Amendment right against unreasonable searches and seizures and that the consent was the result of intimidation and conversion, lacked comprehension, and was illegally obtained. (Doc. No. 250 at 9). Guerrero argues that even if the consent was valid, forensic examination of the phone exceeded the scope

20

of the consent because he did not know that if he consented to the search "the Government would send the phones for forensic examination that would pull out all of his contacts, texts, call history, web history, GPS data, and other personal information." (*Id*. at 14). He contends that his consent to search the phone was limited to reviewing the contents of the phone with the agents during the interrogation. (*Id*.).

The Government argues the motion should be denied because Guerrero knowingly and voluntarily consented to the search of the two cell phones during the custodial interview on May 2, 2019. (Doc. No. 322 (citing signed consent form, Doc. No. 322-1)).

## A.    Consent[7]

During the interrogation in the DEA Office the agents asked Guerrero for permission to "look through his phones." At first, he evaded the question, but he eventually agreed to allow agents to search his phones and provided the passcode. (Doc. No. 252-2 at 20-32). The relevant portions of the exchange are:

> SA Hicks: Okay. Would you let me – give me permission to look through your phone?
>
> Guerrero: (inaudible) way better, but just can you check with somebody? I can – I can – to be honest, I want – I want out of all this.
>
> …
> SA Hicks: So my question is, what does that have to do with you giving me permission to look through your phone?
>
> Mr. Guerrero: Well, you probably won't need me anymore. You just want to go after.
>
> SA Hicks: That's what you are worried about?

---

[7]      Normally, the Court would not reprint a lengthy colloquy. However, the verbatim transcript shows the nature of the exchange between the agents and Guerrero more effectively than a summary.

Guerrero: Yeah, you're going after the guys. And the guys are going to be like, well this case from Tennessee. We got this guy in Tennessee. So, this is the one.

SA Hicks: So – but just because – all right. So, just because I can go through your phone doesn't mean that you aren't valuable for explaining things though.

Guerrero: Yeah, yeah, yeah.

SA Hicks: So I would still need you to explain things.

Guerrero: Yeah.

SA Passmore: And you have to think of it too. We're going to get in your phones. We are going to do a search warrant if you don't give us permission.

Guerrero: Okay

SA Passmore: And then if we find the numbers, then we're not going to say that, oh, Amador didn't tell us about this, we had to go get it.

Guerrero: Uh-huh (affirmative). I mean, it's --- …

Guerrero: Yeah, yeah. I mean, it's like I'm telling you, though, the flip phone is the one where you're going to find –

SA Hicks: Okay, I believe you.

Guerrero: Yeah.

SA Hicks: So my question is –

Guerrero: I mean, I'm being honest with you.

SA Hicks: And you have been. I'm not disputing that. I'm not trying to fight with you. All I am asking for is an answer, a yes or no. Can I look through the phone or not?

Guerrero: Yeah, you can look on the flip phones though.

SA Hicks: Okay.

Guerrero: Yeah.

SA Hicks: The other one is a personal phone?

22

Guerrero: My personal phone.

SA Hicks: Okay. Is there any drug trafficking talk on there?

Guerrero: No. …

…

SA Hicks: Can I look through the personal one … can I look through there just to make sure there's some lead or something that might be useful to me?

SA Passmore: Sometime people call –

Guerrero: There's one. There's one number that you –

SA Hicks: What is that number that I need to look for?

Guerrero: It's – I don't remember the number. But I can show you though …

SA Hicks: Okay. If I go get the phones, would you show me?

Guerrero: I can show you – I can show you the number.

SA Hicks: Okay. Can you wait right here while I go get them?

Guerrero: Yeah, okay.

SA Hicks: You're going to get them. Okay. They're on my desk.

SA Passmore: Okay.

SA Hicks: So, you're going to tell – if I look through both of them, you'll show me right now?

Guerrero: I'll show you right now.

SA Hicks: All right.

[SA Passmore left and returned with the consent form.]

SA Passmore: So, let me explain this. English or Spanish, which do you read better?

Guerrero: Spanish I read better. It's my first language.

SA Passmore: Okay.

Guerrero: But I can understand English.

SA Passmore: That's fine. Okay.
…
SA Passmore: Sign and print your name.

Guerrero: Okay

SA Passmore: And print your name.

SA Hicks: Can you – can you hand me the smart phone please?

SA Passmore: Yeah. I'm going to put the date right here, okay?

Guerrero: (Nods head up and down).

SA Hicks: This one's yours, right?

Guerrero: Yes.

SA Hicks: Okay. Your wife was trying to tell me which one was which. All right. How do you unlock it?

Guerrero: It's 7920.

SA Hicks: 7920?

Guerrero: Uh-huh (Affirmative).

SA Passmore: That's the pass code, right? Okay.

(*Id.*).

## B.    Voluntariness of Consent

The Fourth Amendment permits warrantless searches with valid consent. *United States v.*

*Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

(1973)).  The validity of consent is based on "the totality of all the circumstances," *Harris v. Klare*,

902 F.3d 630, 639 (6th Cir. 2018) (quoting *Schneckloth*, 412 U.S. at 227), which the government

must prove "by a preponderance of the evidence, through clear and positive testimony," *United States v. Blomquist*, 976 F.3d 755, 758 (6th Cir. 2020). "To be valid, the consent must be voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021) (citation and internal quotations omitted). "Relevant considerations include the characteristics of the person being interviewed—age, education, intelligence—and the circumstances of the situation, like whether the police told him about his constitutional rights, how long the interview lasted, and whether police asserted authority to take the action regardless of consent." *United States v. Parrish*, 942 F.3d 289, 294 (6th Cir. 2019) (citing *Schneckloth*, 412 U.S. at 226 (collecting cases)).

At the time of the interrogation, he was almost 30 years old with limited formal education. Guerrero was not under the influence of drugs or alcohol. He had been advised of his *Miranda* rights and indicated understanding of those rights to refuse consent to search. The video footage confirms that SA Hicks and SA Passmore never drew their weapons, made no threats, did not raise their voices and engaged with Guerrero in a serious but cordial manner. In this case, Guerrero evaded giving consent by asking the agents to "check with someone," but he did not clearly refuse consent. And when he did sign the consent to search, the agents provided him a form in Spanish – his first language.

Guerrero argues he was coerced into consenting to the search because the agents continued to ask for consent after he avoided answering the question and they threatened to obtain a search warrant if he did not consent. True, the agents did ask for consent to search the phones more than once. But the mere repeat of the question, without more, is not objectively coercive. Nor is the "threat" to perform a lawful search objectively coercive. *United States v. Jacobs*, 63 F.4th 1055,

25

1059 (6th Cir. 2023). There appears to be little question that there was probable cause to search the phones for evidence of drug dealing and money laundering.

Under these circumstances, the Court finds the consent to search the cell phones was voluntary.

## C. Scope of the Consent to Search

Guerrero contends the forensic examination of his cell phones exceeded the scope of his consent to search. (Doc. No. 250 at 14). He also suggests that the consent to search was limited to the flip phone and did not include the smart phone. (Doc. No. 366 at 11).

The standard for measuring the scope of consent is objective reasonableness—what a reasonable person would have understood by the exchange between the officer and the suspect. *Florida v Jimeno*, 500 U.S. 248, 251 (1991). A person may limit the scope of the consent. *See United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004). "But if his consent would reasonably be understood to extend to a particular container, [then] the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Jimeno*, 500 U.S. at 252.

As evident from the discussion between Guerrero and the agents regarding the search of the cell phones, Guerrero consented to the search of both phones. Indeed, he even provided the passcode for the smartphone. While he may not have understood the parameters of allowing a search of the phones – *i.e.*, a full forensic search – neither did he state that the consent was limited to search of the phones for things he would discuss during the interview. Instead, he signed a written consent to search a "Blue Flip Phone" and a "Black Smart Phone" and provided the passcode. The forensic search of the phones did not exceed the scope of the search.

For these reasons, the Motion to Suppress Cell Phone Evidence will be **DENIED**.

26

## V.    CONCLUSION

For the reasons stated herein Guerrero's motions to suppress evidence obtained pursuant to wiretaps (Doc. No. 256), statements made on May 2, 2019 (Doc. No. 249), and cell phone evidence (Doc. No. 250) are **DENIED**.  The motion to suppress evidence obtained pursuant to a Facebook search warrant (Doc. No. 253) is **MOOT**.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE